NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

_____
                                          :
IN RE:                                    :        CHAPTER 7
                                          :
 ROBERT HICKMAN,                          :        CASE NO.  11-39943(GMB)
                                          :
                    Debtor.               :
_____ :
                                          :
JOHN C. McMAHON, JR.,                     :        ADVERSARY NO.  12-01043(GMB)
JAMES LANGSDORF,                          :
JAMES McCORMICK, and                      :
ELON PROPERTIES, L.L.C.,                  :
                                          :
              Plaintiffs.                 :
       v.                                 :
                                          :
ROBERT HICKMAN,                           :
                                          :        MEMORANDUM  O P I N I O N
                    Debtor/Defendant.     :
_____ :

APPEARANCES:    Jeffrey A. DiLazzero, Esq.
                99 N. Main Street
                Second Floor
                Mullica Hill, NJ 08062
                Attorney for Plaintiffs

                Adam D. Greenberg, Esq.
                Honig & Greenberg, LLC
                1949 Berlin Road, Suite 200
                Cherry Hill, NJ 08003
                Attorney for Debtor/Defendant

# I.    INTRODUCTION

This matter comes before the Court upon the filing of an adversary complaint by

Plaintiffs, individually, and as members on behalf of Elon Properties, LLC ("Elon"), to

determine the dischargeability of a debt owed by the Debtor, Robert Hickman ("Debtor"),

pursuant to 11 U.S.C. § 523(a)(4) for fraud or defalcation while acting in a fiduciary capacity, or

in the alternative, embezzlement or larceny. In addition, Plaintiffs request the Court deny Debtor a discharge under §§ 727(a)(4) and 727(a)(5) for failure to disclose assets to the Court or explain the loss of assets sufficiently.

The Debtor and his wife, Kimberly E. Hickman, commenced their joint Chapter 7 case on October 14, 2011. On January 13, 2012, the Plaintiffs initiated this adversary proceeding against Debtor. The trial commenced on June 13, 2013. During the course of trial, the Plaintiffs' argument centered on a series of checks that the Debtor wrote to himself during his time as President and manager of Elon, a New Jersey limited liability company, formed by the Debtor and the Plaintiffs in 2004.

After a comprehensive trial in which four witnesses testified and over one hundred and thirty exhibits were introduced into evidence, the Court concludes that the Plaintiffs failed to meet their burden to prove that the Debtor did not disclose assets under § 727(a)(4) or explain the loss of assets sufficiently under §727(a)(5). However, the Court does find that $51,250 of Plaintiffs claim is nondischargeable as having been embezzled from Elon's business accounts. For these reasons the Court grants in part and denies in part Plaintiffs' request to determine that their debts are non-dischargeable.

## II.      JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(b), and the Standing Order of the United States District Court for the District of New Jersey dated July 23, 1984 as amended Sept 18, 2012 referring all bankruptcy cases to the bankruptcy court. Venue of the case is proper in the District of New Jersey pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I), (J) and (O). The following shall constitute the Court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

## III.     FINDINGS OF FACT

Forming of the business

In September 2004, the Debtor entered into a business arrangement with longtime friends, John C. McMahon, Jr. ("McMahon"), James Langsdorf ("Langsdorf"), and James

McCormick ("McCormick") (collectively, "the Plaintiffs"). Elon Properties, LLC, a New Jersey limited liability company, was formed for the purposes of acquiring, developing, selling and/or leasing real estate.  All three plaintiffs invested in Elon under the collective belief in Debtor's business acumen and his expertise in entrepreneurship due to the prior success of his medical supply company.

<u>Financing of Elon</u>

In order to capitalize Elon, both Plaintiffs and Debtor contributed initial funding equal to their ownership interest. The money invested and the ownership interest of each is outlined as follows:

|  | <u>Investment</u> | <u>% Ownership</u> |
|---|---|---|
| Robert C. Hickman | $450,000 | 66.667% |
| James W. Langsdorf | $75,000 | 11.111% |
| James P. McCormick | $50,000 | 7.407% |
| John C. McMahon, Jr. | $100,000 | 14.815% |

In addition to the initial start-up capital, Elon took out a loan from Millville Savings Bank. Plaintiffs and Defendant personally guaranteed the loan. Pledged as collateral for the loan were the Debtor's personal residence, McCormick's personal residence, and the home of McCormick's mother.  Each plaintiff testified at trial that he believed the loan proceeds were only going to be used for real estate investment.

<u>Functioning of the Company</u>

Plaintiffs and Defendant signed the Operating Agreement of Elon Properties, LLC ("Elon Operating Agreement") on September 1, 2004. (Ex. P-37.) Each of the Plaintiffs and the Debtor were named Managers of Elon pursuant to this agreement. Each Manager was vested with the responsibility for "the management of the business and affairs of the Company" according to Elon Operating Agreement, Article VI 6.1. Additionally, under Article VI 6.1, each manager was vested with specifically enumerated powers, but retained "all rights and powers and [would] make all decisions affecting the Company in furtherance of the Company's purposes." (Ex. P-37.)

Despite language in the Elon Operating Agreement, testimony at trial evidenced that Debtor was the primary, and in most cases, the only person responsible for all business functions of Elon. He was, pursuant to Article VII Section 7.5 of the Operating Agreement, the Chairman, President, Secretary, and Treasurer of Elon. In return for his role as President, Debtor was given a weekly salary of $1,000 and was provided a car and cell phone allowance. None of the Plaintiffs initially objected. Debtor kept all of Elon's books and records. These records were memorialized in QuickBooks software that the Debtor testified he meticulously updated. Occasionally during the course of a year, Debtor would call the company's accountant to inquire about certain accounting practices. After these conversations, he adjusted his QuickBooks records accordingly. He was the only one with access to the bank debit card and checkbook of Elon properties. Despite his seemingly diligent record keeping, both Plaintiffs and Defendant demonstrated at trial that the Defendant lacked a true understanding of universally accepted accounting practices for a small business.

The roles of the other managers were limited. McCormick and Langsdorf were self-titled "silent partners." Although they had the title of "Manager" in the operating agreement, they testified to having no day-to-day responsibilities in the management of Elon. Besides calling the Debtor, they failed to inquire independently about the records of Elon, the investments of Elon, or the business practices of Elon. In fact, they testified to often neglecting to read documents which Debtor provided to them. As a result, Plaintiffs were only provided balance sheets on a semiannual basis and K-1 documents for tax reporting purposes.

By contrast, McMahon held a somewhat larger role in the company. He was, according to his testimony, in communication with Debtor, and assisted in some limited decision making in his position as Vice President.

Collectively, the Plaintiffs were compensated with reimbursement for acquiring required life insurance policies. In addition, all four managers received dividend checks from Elon as return on their investment. Both dividend checks and life insurance reimbursement checks were signed only by Debtor and were often in amounts in excess of $500.00.

At trial, it was established that none of the parties adhered to the Elon Operating Agreement they signed in 2004. For example, Debtor frequently used his own money for

4

business expenses. He then was reimbursed for these purchases by Elon, often in excess of $500.00. Debtor, as President and Manager of Elon, wrote himself a check to facilitate reimbursement. Debtor's practices with regard to reimbursement were generally understood by the other managers but conflicted with the Elon Operating Agreement Article VI Section 6.4, which required that "expenses in excess of $500.00 per month" receive approval of the Board of Managers. It was also in direct contravention to Article VI Section 6.1(c), which required that checks over $500.00 be signed by two managers. Although Section 6.1(c) signature requirement was possibly observed in the beginning of the company's formation, McMahon and Debtor orally agreed to waive this obligation without consulting the other managers, whose permission was required by the Operating Agreement under Article XI Section 11.1. Furthermore, despite asserting that Debtor's failure to adhere to this provision in the Operating Agreement was inappropriate, all three plaintiffs accepted numerous checks in excess of $500.00 signed only by Debtor, never questioning this practice.

Loans from Elon to the managers were also permitted. No terms or interest rates were ever discussed. For example, in July of 2005, due to family illness, Langsdorf received a sizeable loan from Elon.   Debtor wrote a check for $15,000 from Elon's account with only his signature, and neither man sought approval of the other managers of Elon. Plaintiffs all subsequently ratified the transaction and Langsdorf repaid the loan in 2012, without interest. Later in 2008, Debtor received a similar loan, absent terms, with approval of the Plaintiffs.

Checks Written by Debtor for Elon's Business Ventures

At trial, as a basis for their many allegations, Plaintiffs presented numerous checks written by Debtor to himself from Elon's bank account. Each check was in excess of $5,000, totaling approximately $112,000 over the course of his time as president. The largest amounts were written via checks #1166, #1149, and #1297.  (Ex. P-22.) At trial, the Debtor demonstrated that all three of these checks were written to reimburse the Debtor for Elon related expenses. These expenses including deposits on land, home improvement supplies for the properties that Elon was rehabilitating, or allowed administrative allowances, such as a cell phone payment or gas for Debtor's car.

In 2006, McMahon and Debtor decided to buy rental property in Myrtle Beach[1] on behalf of Elon. Debtor purchased the condominium in his own name, due to alleged restrictions by the seller on purchase by an LLC. To cover the initial $10,993 deposit on the property, the Debtor wrote a personal check for $5,000.00, and Elon check #1183 for $5,993 to Centex Homes. Elon later reimbursed the Debtor for the $5,000 via Elon check #1184.  All of these transactions were memorialized in the QuickBooks records for the transaction, as well as on the condominium settlement statement. (Ex. D-13.)

Advances and reimbursements of this nature were common and went on for several years. The Plaintiffs admitted in testimony that they knew of and accepted this practice. Plaintiffs did not present evidence to controvert the Debtor's accountings of his reimbursements.

Arkansas Property and check #1396

In 2006, with approval of all four managers, Elon purchased nine lots in Arkansas based upon a proposed retirement community being built in the area. Each lot was purchased for an amount ranging from $8,000 to $13,500. (Ex. P-61; P-62.)  At the time, the Debtor individually co-owned another lot in the area, Lot 8/blk 2 Montana, with a third party, which had been purchased for $10,500. The lots quickly lost value after their acquisition. In a November 2006 e-mail to Plaintiffs, Debtor wrote,

> arkansas is dead. hundreds of lots for sale. but these lots are a long term investment and we will make money eventually. we could price them rock bottom and roll them, but that is something we need to discuss.

(Ex. P-60.) On January 2, 2007, Debtor bought out the interest of the third party co-owner of his lot for $1,000.  Then, in February of 2008, Debtor wrote himself check #1396 from Elon's bank account in for $11,250, which he testified represented Elon's purchase of Lot 8/blk 2 Montana from the Debtor. (Ex. P-22; Ex. D-17.) When asked at trial why Elon bought the lot, the Debtor testified it was to fulfill Elon's agreement to buy ten lots.  However, the Debtor produced no evidence of an agreement to buy ten lots. He further testified that the lots became worthless in

---

[1] In addition to questioning the reimbursement, Plaintiffs attempted to prove that Debtor was paying his own mortgage out of Elon funds as opposed to the mortgage on the condo via five checks written for $1,500 from Elon Properties LLC to Chase Manhattan. (Ex. P-23; Ex. D-18).  The theory was founded on the idea that the $1,500 was more than the condo's mortgage payment. Defendant obtained the mortgage payment record from Chase (Ex. D-68) which showed that he had been paying the monthly mortgage on the condominium, in the amount of $1,500 a month.

2008. (Trial Tr. 34-35, June 16, 2013.) The other managers testified they did not know of any contract, nor did they approve the purchase of a tenth lot. The title of this property remains in the Debtor's name and he listed it as individually owned on his bankruptcy petition. (Trial Tr.137:6-20, June 16, 2013.)

Loans

In addition to lending Elon money, there were times when the Debtor would borrow money from Elon. For example, on March 20, 2006 Debtor wrote a check # 1040 to himself in the amount of $10,047.16 with a subject line that read "Spring Garden deposit." Debtor testified that $8,000 of the $10,047.16 was a loan to him personally. The balance of check #1040 was to reimburse the Debtor for the deposit he made on a piece of property and for landscaping supplies. (Trial Tr. 108:15 to 110:15, June 16, 2013.) According to Debtor's testimony, he occasionally needed money and would write a check to himself from Elon's accounts, then would subsequently pay Elon back. (Ex. D-11; Ex. P-32.) Debtor acknowledged that no other manager knew about the loans, but admitted they went on throughout his tenure, and that he would pay back the loans anywhere from weeks to months later. Similar to the loan to Langsdorf, there were no written terms to the loans and no interest rate attached.

Investment in After 5

Initially, all investments of Elon were in real estate. However, when the real estate market declined in 2006, Elon invested in a business known as After 5 Distributors, LLC ("After 5"). At the time Elon invested, After 5 was to be a distribution intermediary, fully owned and managed by Debtor and an individual named Mike Smart. It was to operate by purchasing frozen drink mix from a supplier in Texas under a license agreement, and reselling to restaurants, casinos, and bars in New Jersey. As part of its operating plan, the company would install and maintain special drink mixer machines in bars buying the mix. The company planned to generate profits from resale, as well as via expected reimbursements from a liquor distributor whose products were used with the mix.

Elon's investment in After 5 was agreed to by Plaintiffs after Debtor presented information about the company. No independent due diligence was conducted by the Plaintiffs. The managers agreed that Elon would invest $110,000 for a 25% share in After 5. When the

7

Debtor wrote the initial check #1329 on May 19, 2007 to fund After 5, the Plaintiffs also agreed that Elon would also lend the Debtor $15,000. (Ex. P-24) This $15,000 was included with the $110,000.000 and a check in the amount of $125,000.00 was deposited into After 5's account. The loan was recorded in QuickBooks, and Debtor subsequently paid Elon back $15,000 in several payments over the next year. There were no terms or interest rate on the loan. Nor did the Debtor or the Plaintiffs explain the purpose of the loan. Under the After 5 Operating Agreement, signed in the Spring of 2007, ownership in After 5 was as follows: Debtor 25%, Elon 25%, McMahon 10%, and Mike Smart 40%, based on capital investment. (Ex. D-5.) As the original owner of the licensing agreement, Mike Smart did not make a monetary contribution, but was to help run the business and in exchange, retain part ownership. (Trial Tr. 30, June 16, 2013.)

In 2007, Elon invested an additional $88,000 of capital in After 5 in order to buy Mike Smart's interest in the business. In return, Elon acquired only an additional 25% ownership in After 5, bringing Elon's ownership interest to 50%. (Trial Tr. 31, June 16, 2013.) No explanation was given as to why Elon did not acquire the full 40% interest of Mike Smart in exchange for its capital infusion.

This was not the end of Elon's investment, as Debtor wrote another check from Elon to After 5 in January of 2008 for $22,000. This brought Elon's investment in After 5 to $220,000, although it obtained only a 50% interest in the company. (Ex. D-26; Trial Tr. 148, June 16, 2013.) Despite this, for a reason unexplained at trial, on February 1, 2008, Plaintiffs and Debtor restructured After 5 and transferred Elon's shares in After 5 to the individual members of Elon. Elon's 50% ownership in After 5 was therefore distributed between Debtor and Plaintiffs according to their ownership interest in Elon.

It was at this point in 2008, Debtor testified that Elon began to issue loans to After 5, as it was no longer a member. Elon loaned After 5 $75,000 in March of 2008. (Ex. D-26; Trial Tr. 148-49, June 16, 2013.) On June 4, 2008, Elon loaned After 5 an additional $4,000. The Debtor documented both of these loans in the QuickBooks software. At trial, Plaintiffs and Debtor presented checks written directly from Elon to After 5, as well as testimony from both parties indicating that the Debtor did not seek the approval of the Plaintiffs before deciding to loan After 5 the money from Elon.

8

The Debtor further testified that an additional $40,000 was loaned to After 5 during the month of May of 2008. Unlike the March and June loans that came directly from Elon, this particular loan was allegedly "fronted by Rob Hickman for Elon Properties." (Ex. D-26.) According to Debtor's testimony, this statement, memorialized as a QuickBooks entry, indicated that he personally loaned After 5 the $40,000.00 on behalf of Elon and planned to have Elon reimburse him when Elon had the cash available. Debtor failed to present sufficient documentation to support his version of the transaction.

Debtor testified that he was then reimbursed for the loan he "fronted" via Elon check #1436 written August 24, 2008 for $40,000. He justified both transactions by explaining at trial that he "eliminated a couple of steps . . . . I could have taken this check from Elon for $40,000, and wrote it to After 5, and then have After 5 pay me." (Trial Tr. 24:25 to 25:7, June 17 2013.)

At the time that the Debtor "fronted" the money to After 5, it is doubtful that After 5 was making any profit. In 2007 After 5 had net income of $17,478, and in 2008 its income was a negative $188,709. (Ex. P-33.) During this time, Elon was also not operating profitably. In fact, Debtor stopped taking a paycheck as a result of the limited finances. In the beginning of 2008, Elon's largest asset was its investment in After 5 distributors, and two properties owned in New Jersey. (Ex. P-32.) In addition, other assets, such as the nine Arkansas lots, were still listed as assets, although the plaintiff testified their value was zero by the end of 2008.

Ignoring Elon's own financial condition, and the existence of the outstanding Millville Savings loan of $265,000, it was nine days after Elon received money from sale of a property, that the Debtor decided to reimburse himself for a loan. (Ex. D-26.)  The account, which on August 24, 2008 held $79,189, was reduced to $10,000 by September 15, 2008. (Ex. D-18.) Elon's loan to After 5 remained at $79,000, in addition to its $220,000 investment. (Ex. D-26.)

Collapse of Elon and Subsequent Use of Accounts

Testimony at trial indicates that After 5 stopped operating profitably in 2008 when the drink mix license agreement was revoked. It continued to exist as an LLC until 2009, but stopped doing business. According to testimony at trial, between December 31, 2008 and December 31, 2009, After 5's outstanding loan due to Elon was reduced by $27,500, purportedly due to the Debtor's sale of the company's remaining assets.

Besides these loan payments, After 5 bank account statements show money regularly deposited and withdrawn in 2009. (Ex. P-46.) According to Debtor's testimony, he was using the account to deposit paychecks from his new employer, and keeping track of all transactions via QuickBooks with entries entitled "Miscellaneous Rob."

Default on the Millville Savings Loan

In 2010, Elon defaulted on the Millville Savings & Loan Association loan.  Plaintiffs and Debtor then entered into an agreement with the bank to refinance the loan from revolving line of credit to a fixed rate loan. They began making loan payments in August of 2010 based on their percentage ownership in Elon. (Trial Tr. 146, June 17, 2013). In the fall of 2011, Elon defaulted on the loan due to Debtor's failure to make his payment. It was at this time that the Plaintiffs purchased the loan from Millville Savings. (Trial Tr. 147, June 17, 2013).

Debtor's Bankruptcy

Debtor and his wife, Kimberly Hickman, filed for bankruptcy on October 14, 2011. On their initial schedules, Debtor listed $150.00 in a joint Ocean City bank account. Subsequently, on their amended schedules filed March 29, 2013, Schedule B lists the Ocean City account as belonging solely to Kimberly Hickman and current value of the account as $463.32. On the date Debtors filed the petition, the account initially held $463.32, but, as a result of Kimberly Hickman's paycheck being direct deposited, it increased to over $1,000. (Trial Tr. 55, June 16, 2013).

Additional assets listed in Debtor's petition included his interest in Elon, valued at $100, his wife's jewelry valued at $2,000 and the Arkansas lot he testified he sold to Elon. In his amended schedules, filed in 2012 and 2013, Debtor updated the value of his interest in Elon to $1.00 and his wife's jewelry to $6,000.

In 2007, Debtor purchased stock in Transplant Connect, which he described as a "start-up company" for $50,000.  (Trial Tr. 100-01, June 16, 2013.)  In 2008 he attempted to sign this stock over to his minor children.  He remained Trustee. Debtor failed to list ownership in this stock on his bankruptcy schedules. He also failed to list his trustee status. Debtor amended his schedules to list this stock as property held for another person after depositions were taken in the present adversary action. The current market value of the Transplant Connect stock remains

undetermined as no attempts to sell it were made and Debtor testified to the fact that it was a high-risk investment in a small privately held business.

Prior to filing bankruptcy, on July 19, 2011 Debtor formed RCH Enterprises for a potential business opportunity. RCH had no assets and conducted no business, yet RCH's bank account statements show transactions through December 27, 2011. According to the Debtor's testimony, he deposited his paycheck into the account and used the account to pay his living expenses, thus escaping creditor scrutiny. This stock was not listed on his original schedules. He also did not admit to owning the company at the 341 meeting of creditors, held in November 2011. (Ex. P-39 Transcript of Meeting of Creditors). As of October 2011, when Debtor filed bankruptcy, there was $2,629 in RCH's account from Debtor's deposit of his paychecks.

Plaintiffs make several other allegations regarding assets of the Debtor that were not listed in his petition. These include: low risk bonds, stock in his previous company, monies owed from the sale of his previous company, and stock options from his new employer. These were all based on statements made by Debtor throughout his relationship with Plaintiffs, and Debtor testified he held none of these alleged assets. Plaintiffs produced no evidence to contradict his statements.

## IV.    CONCLUSIONS OF LAW

For the reasons that follow, the Court finds Plaintiffs' claim in the amount of $51,250 is nondischargeable having been embezzled from Elon LLC. The balance of Plaintiffs' claim is dischargeable.  The Court further finds that the Plaintiffs did not sufficiently establish that Debtor acted fraudulently in connection with his bankruptcy petition nor insufficiently explain his loss of assets and therefore judgment in favor of the Defendant will be granted denying Plaintiffs request for relief pursuant to 11 U.S.C. §§ 727(a)(4) and 727(a)(5).

### A. Section 523(a)(4)

Section 523(a)(4) of the Bankruptcy Code provides that an individual debtor cannot obtain a discharge for any debt obtained via "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). To prevail on a claim of non-dischargeability under 11 U.S.C. § 523(a), each element must be proven by a "preponderance of

the evidence" by the party asserting non-dischargeability. <u>Grogan v. Garner</u>, 498 U.S. 279, 285, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

**1**. **Fraud or defalcation while acting in a fiduciary capacity**

**(a) Fiduciary capacity**

In order to prevail, Plaintiff must first prove that the Debtor acted in a fiduciary capacity. Bankruptcy laws pertaining to the exception to discharge for debtors acting in a fiduciary capacity are constructed to promote the Bankruptcy Code's "fresh start" policy. <u>Casini v. Graustein</u>, 307 B.R. 800, 817 (Bankr.D.N.J. 2004). As such, courts have limited the definition of a fiduciary for Section 523(a)(4) purposes. "Neither a general fiduciary duty of confidence, trust, loyalty, and good faith ... nor an inequality between the parties' knowledge or bargaining power ... is sufficient." <u>Fowler Bros. v. Young (In re Young)</u>, 91 F.3d 1367, 1372 (10th Cir. 1996). Thus, the scope of the term "fiduciary" in the context of section 523(a)(4) is limited to "instances involving express or technical trusts." <u>In re Casini</u>, 307 B.R. 800, 817 (Bankr.D.N.J.  2004).

While federal law governs the definition of "fiduciary," courts rely in part on state law to ascertain whether the requisite trust relationship exists. <u>In re Cantrell</u>, 329 F.3d 1119, 1125 (9th Cir. 2003). A technical trust arises under state statute or common law. <u>In re D'Anello</u>, 477 B.R. 13, 24 (Bankr.D. Mass. 2012). Alternatively, an express trust arises by party agreement. <u>In re Penn Cent. Transp. Co.</u>, 486 F.2d 519, 524 (3d Cir. 1973). Under Elon's Operating Agreement, New Jersey law applies.

Plaintiffs assert Debtor owed them a fiduciary duty as creditors of the Debtor as they purchased the Millville Savings obligation that they and Debtor personally guaranteed. However, the Court will also consider whether the Debtor owed the Plaintiffs or Elon a fiduciary duty arising from his role as a manager or as the President of Elon.

**(1) Express Trust**

Under their own agreement, the Plaintiffs and Debtor failed to impose a fiduciary duty upon Debtor. Plaintiffs and Debtor agreed, "A Member . . . shall have no obligation or liability, express or implied, to the Company or the other Members, except as specifically set forth in this Agreement." Elon Operating Agreement Article VI Section 6.2(a). The agreement went on to

make no further mention of even a general duty of loyalty and care, nor establish a trust obligation on any member. Therefore, no express trust arose as a result of the parties' agreement.

### (2) Technical Trust

Plaintiffs' first argue that under New Jersey Law, they are owed a fiduciary duty as creditors of Elon. Under New Jersey law, directors of an insolvent corporation, once it becomes insolvent, owe a fiduciary duty to creditors and cannot prefer one creditor to another, or prefer themselves. Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 173 (3d Cir. 2002). Bankruptcy Courts in this jurisdiction accept this quasi trust relationship arising from insolvency as sufficient to find debtor liability under 523(a)(4). See generally, Casini v. Graustein, 307 B.R. 800, 819 (Bankr.D.N.J. 2004). The critical inquiry to determine whether a technical trust as to creditors exists is "whether the fiduciary obligation arose chronologically before the wrongdoing or as a result of the wrongdoing." In re Carretta, 219 B.R. 66, 73 (Bankr.D.N.J. 1998).

Plaintiffs failed to prove the requisite factual predicate to support the finding of a fiduciary duty arising from this type of trust. Because Plaintiffs failed to prove if and when Elon became insolvent, the Court is unable to determine that a fiduciary duty arose prior to the time of the Debtor's allegedly improper acts.

In declining to find a fiduciary relationship arising out of insolvency, the Court looks to New Jersey statute and case law to determine if a fiduciary obligation arose from Debtor's position as a manager or president of Elon.[2] The Court notes in September of 2012, New Jersey published the Revised Uniform Limited Liability Company Act, which applies to LLCs formed after March 18, 2013.[3] Elon was formed prior to this date.  Under the New Jersey Limited

---

[2] Debtor asserts in his post-trial brief that the fiduciary duty of Debtor as a manager of Elon was not raised in Plaintiff's complaint. The Court disagrees, as Plaintiffs pled a breach of fiduciary duty under 523(a)(4). In addition, Fed. R. Bankr.P. 7015(b) provides in part that "when issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Fed. R. Bankr.P. 7015(b) "may be employed in a way that has the effect of amending a pretrial order." In re Byers, 304 B.R. 1, 7 (1st Cir. BAP 2004) (quoting Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d §§ 1491, 1493 (1990 & Supp. 2003)). Therefore, as Defendant did not raise this issue in trial, and Plaintiff went on to provide substantial evidence regarding the duty of managers, the Court will include this in its analysis.

[3] The current Revised Uniform Limited Liability Company Act § 42:2C-39, Effective March 1, 2014,  reads in part:

Liability Company Act, N.J.S.A. § 42:2B-1, et seq.(the "NJ LLC Act"), in effect when Elon was

formed, there was no trust obligation imposed on members of a New Jersey LLC. Instead, the

statute read in relevant part:

> b. To the extent that, at law or in equity, a member or manager has duties
> (including fiduciary duties) and liabilities relating to a limited liability
> company or to another member or manager: (1) any member or manager
> acting under an operating agreement shall not be liable to the limited
> liability company or to any other member or manager of the limited
> liability company for the member's or manager's good faith reliance on the
> provisions of the operating agreement; and (2) the member's or manager's
> duties and liabilities may be expanded or restricted by provisions in an
> operating agreement.

N.J.S.A. § 42:2B-66 (1994).  The NJ LLC Act further provided that unless otherwise agreed to in

an operating agreement, the member or manager of an LLC would not be personally liable for

any reason except in the case of gross negligence or willful misconduct. N.J.S.A. § 42:2B-30

(1994). In addition, the operating agreement may eliminate or limit the personal liability of

members or managers. N.J.S.A. §§ 42:2B-26, 30 (1994). Absent a duty provided for in the

Operating Agreement of the LLC, the NJ LLC Act does not impose a fiduciary duty on LLC

members. See, In re D'Amore, 472 B.R. 679, 688 (Bankr.D.N.J. 2012).

Parties both point to Sofia Design & Development v. D'Amore (In re D'Amore), 472

B.R. 679, 687 (Bankr.D.N.J. 2012) in support of their respective arguments. While the decision

---

a. A member of a member-managed limited liability company owes to the company and, subject to
subsection b. of section 67 of this act, the other members, the duties of loyalty and care stated in
subsections b. and c. of this section.

b. The fiduciary duty of loyalty of a member in a member-managed limited liability company includes the
duties:
> (1) to account to the company and to hold as trustee for it any property, profit, or benefit derived
> by the member:
>> (a) in the conduct or winding up of the company's activities;
>> (b) from a use by the member of the company's property; or
>> (c) from the appropriation of a company opportunity;
> (2) to refrain from dealing with the company in the conduct or winding up of the company's
> activities as or on behalf of a person having an interest adverse to the company; and
> (3) to refrain from competing with the company in the conduct of the company's activities before
> the dissolution of the company.

N.J. Stat. Ann. § 42:2C-39 (2012).

in that case was based on other grounds, this Court disagrees with the suggestion that a fiduciary duty arose in favor of a member of an LLC under the prior law.

As neither the statute nor Elon Operating Agreement created a trust, this Court declines to find that a fiduciary relationship existed at the time of any alleged defalcation or fraud.

### 2. Embezzlement and Larceny

The Court now turns to the question of whether Debtor committed embezzlement or larceny. Under §523(a)(4)(A), "while acting in a fiduciary capacity" modifies only the phrase "fraud or defalcation"; it does not modify the phrase "embezzlement or larceny". Ginsburg ex rel. Vertical Group, Inc. v. Birenbaum (In re Birenbaum), 2006 Bankr. LEXIS 1335 at *22 (Bankr.W.D. Pa. July 6, 2006). Therefore, a debtor does not need to be acting in a fiduciary capacity when committing larceny or embezzlement for the debt to be excepted from discharge under §523(a)(4). Webber v. Giarratano (In re Giarratano), 299 B.R. 328, 337 (Bankr.D. Del. 2003).

Larceny under § 523(a)(4) necessitates a showing that the debtor wrongfully took property of another, without the owner's consent, with intent to convert the property. Danbury v. Scheller(In re Scheller), 265 B.R. 39, 53 (Bankr.S.D.N.Y. 2001). As President and manager of Elon, the Debtor was empowered to manage Elon's accounts. In fact, testimony at trial indicated that the Plaintiffs authorized the majority of actions undertaken by the Debtor, including issuing Elon checks with only his signature and executing reimbursements. Because the Debtor had consent to handle the funds of Elon, larceny cannot be proven.

Alternatively, to prove embezzlement occurred under § 523(a)(4), a court must find that: (1) the debtor was entrusted; (2) with property; (3) of another; (4) which the debtor appropriated for his own use; (5) with fraudulent intent. Scheller, 265 B.R. at 54. Fraudulent intent may be inferred from a debtor's actions and surrounding circumstances. In re Bevilacqua, 53 B.R. 331, 334 (Bankr.S.D.N.Y. 1985).

Pursuant to the Elon Operating Agreement, as President of Elon, the Debtor was solely entrusted with finances of the LLC. He had the only ATM card and held the only checkbook for the company. Thus, the first three elements of embezzlement are met. With regard to certain

transactions, the Plaintiffs have also proven that the Debtor appropriated property for his own use with fraudulent intent.

For the most part, the Court finds the Debtor sufficiently demonstrated by virtue of Plaintiffs' lack of diligence and general agreement to his business practices, that he acted with Plaintiffs' authority regarding the majority of the questioned transactions, including reimbursements made to him, as well as checks he signed in excess of $500.00. In general, Debtor was able to substantiate that he wrote the checks as reimbursements for payment he made on Elon's behalf and that they were not for his own benefit. This included, but was not limited to, checks # 1166, 1149, 1262 and 1297, which Plaintiff demonstrated were reimbursements for land deposits, administrative expenses, and other Elon related purchases.[4] (Ex. D-16,12,14,15). In addition, check #1184, Debtor demonstrated, was for reimbursement for a Myrtle Beach Condo deposit the he initially paid. (Ex. D-13.) Debtor also provided substantial documentation for check #1040, which showed that Debtor reimbursed himself for a deposit on land and landscaping supplies. (Ex. D-11.) At a certain point, however, Debtor's actions went beyond his normal practices, and he made payments to himself, which were not for the benefit of Elon.

The Court also does not find embezzlement occurred with regard to Elon's investments in After 5, as Plaintiffs did not prove that those payments were for the benefit of the Debtor or that they were made with fraudulent intent.  The Court finds that the Plaintiffs implicitly approved the additional $110,000 investment by Elon in allowing the Debtor to continue to operate the business without oversight. Thus, the Court does not find that this investment, permitted by Plaintiffs' failure to act with due diligence as managers, constituted embezzlement.

---

[4] Plaintiffs argue that Debtor "embezzled $112,132.85 from Elon Properties by writing unauthorized checks to himself and an additional $189,000.00 by writing unauthorized checks to After 5 distributors." (Doc. 47 pg. 25). The Court does not find these payments to have been unauthorized.

"Waiver is the voluntary relinquishment of a known right evidenced by a clear, unequivocal and decisive act from which an intention to relinquish the right can be based." State v. Mauti, 208 N.J. 519, 539, 33 A.3d 1216, 1228 (N.J. 2012). Testimony of all parties demonstrated that the Plaintiffs and Debtor did not adhere to certain provisions of the Elon Operating Agreement regarding reimbursement amounts and check signature requirements. The fact that Debtor did not get two signatures on checks over $500 is also not indicative of embezzlement. Plaintiffs consented to the practice when they accepted checks that did not conform to the language in the operating agreement and waived any objection by their actions.

The record in this case clearly supports the Plaintiffs claim of embezzlement under 11 U.S.C. § 523(a)(4) with regard to two specific checks written by the Debtor to himself in 2008: Elon check #1436 dated August 24, 2008 in the amount of $40,000.00; and, check #1396 dated February 11, 2011 in the amount of $11,250. Unlike the other checks written as reimbursements and for the benefit of Elon, here, Debtor intentionally appropriated funds for his personal benefit and the Court finds he did so with fraudulent intent.

Documents supplied by Debtor and his trial testimony indicate that Check #1436 represented a repayment of money that Debtor allergy lent to After 5 on Elon's behalf.  By May of 2008, Elon lent After 5 $79,000.00 in addition to its capital investment of $220,000. At this point, Debtor asserts that he advanced another $40,000 on Elon's behalf, as Elon did not have enough cash on hand to loan After 5 any additional funds, although no documents support Debtor's assertion.  On August 24, 2008, Debtor wrote a check to himself in the amount of $40,000. Unlike other transactions Debtor performed as a member of Elon, Debtor's asserted loan repayment was not to benefit Elon or the other managers. For solely his own benefit, Debtor stripped the company of its remaining cash and paid himself a large sum of money, without ensuring that any of Elon's other obligations were satisfied. Moreover, he did so at a time when Elon's assets were minimal and its operations were ending. As fraudulent intent can arise from the facts and circumstances of the event in question, the Court finds that Debtor's act of converting Elon monies to himself, without approval of the managers, while knowing the Company had other obligations which it could not pay, is indicative of embezzlement, as Plaintiff safeguarded his own interests above those of the company or the Plaintiffs.

 Elon's purchase of the Debtor's Arkansas property also constituted embezzlement. In 2006, Elon bought nine lots in Arkansas for approximately $8,000 to $13,000 each, which substantially declined in value shortly after their purchase. Despite its minimal value, Debtor testified that Elon purchased a tenth lot, the one he personally owned, on February 11, 2008 for $11,250. Debtor justified the purchase by referring to an alleged agreement in which Elon was obligated to acquire ten lots. No evidence of a purported agreement was provided. In fact, the deed of the lot in question was never actually transferred to Elon. Instead, for his own personal benefit, the Debtor paid himself funds from Elon, knowing the value of the lot was minimal and,

intending to deprive the other members of this amount. His actions are indicative of fraudulent intent.

**B. Section 727(a)(4) and (5)**

Having now found a portion of Plaintiffs' claim nondischargeable, under 11 U.S.C. § 523(a)(4), the Court turns to Plaintiffs two claims related to denial of discharge arising under §727(a).

It is well-settled law that a denial of a debtor's discharge is a drastic remedy that must be construed strictly in favor of the debtor. Rosen v. Bezner, 996 F.2d 1527, 1531 (3d Cir. 1993) ("Completely denying a debtor his discharge ... is an extreme step and should not be taken lightly"). However, "[a] discharge under §727 is a privilege, not a right and may only be granted to the honest debtor." In re Sicari, 187 B.R. 861, 880 (Bankr.S.D.N.Y. 1994).  The Plaintiff bears the burden of proof establishing the evidence of each of the elements of Section 727 by a preponderance of the evidence. See, e.g., In re Dolata, 306 B.R. 97, 146 (Bankr.W.D.Pa 2004); Fed.R.Bankr. 4005.

**1. Section 727(a)(4)**

Section 727(a)(4)[5] reads in pertinent part that the Court, "shall grant the debtor a discharge, unless. . . . (4) the debtor knowingly and fraudulently, in or in connection with the case (A) made a false oath or account." This provision of the Bankruptcy Code:

> [I]mposes affirmative duties upon a debtor to disclose the existence of all assets and his ownership interest in property and to answer all questions fully and honestly for the benefit of his [or her] creditors and other parties with an interest. . . . in the debtor's

---

[5] In pertinent part, the statute reads that:

The court shall grant the debtor a discharge, unless—
(4) the debtor knowingly and fraudulently, in or in connection with the case--
(A) made a false oath or account;
(B) presented or used a false claim;
(C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or
(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

11 U.S.C. 727 (2005).

bankruptcy case who are entitled to a 'truthful statement of the debtor's financial condition.'

 Scimeca v. Umanoff, 169 B.R. 536, 545 (D.N.J. 1993) aff'd sub nom. In re Scimeca, 30 F.3d 1488 (3d Cir. 1994) (citing In re Henderson, 134 B.R. 147, 159 (Bankr.E.D. Pa. 1991)). The purpose of 11 U.S.C. § 727 is to encourage debtors to disclose their assets, income, expenses, and liabilities so that creditors have adequate information about the debtor's estate. To deny a discharge under § 727(a)(4)(A) of the Bankruptcy Code, a plaintiff must establish by a preponderance of evidence that: (1) the defendant made a statement under oath; (2) the statement was false; (3) the defendant knew the statement was false; (4) the defendant made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. See, e.g., Wachovia Bank, N.A. v. Spitko (In re Spitko), 357 B.R. 272, 312 (Bankr.E.D. Pa. 2006); Scimeca, 169 B.R. at 541.

In the present case, there is no dispute that the statements made by the Debtor in his schedules and at his § 341 hearing were under oath. Accordingly, the first element required to deny a discharge under § 727(a)(2)(A) is met. Moving to (2), the Debtor initially failed to disclose several assets and liabilities in his schedules, including but not limited to his ownership of RCH Enterprises, LLC and his status as trustee for stock in Transplant Connect. Additionally, Plaintiffs allege that the Debtor undervalued several items listed on his schedules, including several pieces of his wife's jewelry, a bank account, and the value of his interest in Elon.

Omissions or false statements caused by an honest mistake or inadvertence are not sufficient to deny a discharge. Spitko, 357 B.R. at 312. Furthermore, an immaterial omission is not sufficient to deny a discharge. Id. An omission is material only if it affects discovery of assets, business dealing, or the existence of property. Id. Although there are exceptions, most courts are reluctant to deny a discharge due to the undervaluation of assets. In re Wines, 114 B.R. 794, 797 (Bankr.S.D. Fla. 1984)(undervaluation of two vehicles was not grounds for denial of the discharge when the trustee had the opportunity to have them appraised).

The Court does not find the Debtor acted with the requisite fraudulent intent when making his statements, or that these omissions were material. On their joint bankruptcy petition, Debtor and his wife valued their bank account at $100, but on the day they filed the Chapter 7

petition, it was just over $2,000. At trial, Plaintiff explained that the bank account in question was his wife's account and held just $463.32 prior to the automatic deposit of his wife's paycheck the day of filing. (Ex. P-8.) A difference of $300 is immaterial to the estate and there was no evidence presented to establish that Debtor knew of his wife's direct deposit, nor intended to hide it from the Trustee or Creditors. Moreover, Debtor's statements regarding his wife's jewelry did not constitute a fraudulent misrepresentation. The re-sale value of used property is often subjective and the amounts of money in the bank accounts were only slightly more than the Debtor reported.  Indeed, the Court notes that the Chapter 7 Trustee had knowledge of bank account, and the allegedly undervalued jewelry, yet chose not to pursue resale or further investigation.

In addition, the Court finds the Debtor's failure to disclose his children's interests in Transplant Connect was an omission by mistake, and furthermore of little value to the estate. First, the Debtor testified that he believed he did not have to disclose his children's stock as it was in their names. Secondly, the investment in a startup company is potentially worthless and the Plaintiffs failed to demonstrate any evidence of marketability of the stock or estimation of its current value.

When the Chapter 7 Trustee asked if the Debtor held an interest in any companies, Debtor only admitted to having an interest in Elon and After 5.  RCH, although formed, never did any business and had no formal operating agreement. It opened a bank account, holding at most just over $2,000 from his paycheck deposits. Although the Court does not condone Debtor's failure to list RCH in his disclosures, it finds the failure was not intentional and the omission was not material. As to Plaintiff's allegations regarding Debtor's stock options, undisclosed stock, the value of his household furniture, or any bond investments, no evidence regarding these allegations was presented during trial.

Accordingly, this Court does not find that Debtor acted with a reckless indifference to the truth when he failed to disclose assets and liabilities on his Petition and in his § 341 testimony. Moreover, even if the Court construed any of the above as false statements by the Debtor, the Court finds that the Debtor's statements and/or omissions were immaterial to the bankruptcy estate. Therefore, the Court will not deny the Debtor's discharge under 11 U.S.C. § 727(a)(4).

**2. Section 727(a)(5)**

A court shall grant a debtor a discharge, unless, "(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727 (2005).

To establish non-dischargeability of a debt pursuant to § 727(a)(5), the plaintiff "has the initial burden of identifying the assets in question by appropriate allegations in the complaint and showing that the debtor at one time had the assets but they are no longer available for the debtor's creditors." Riehm v. Park (In re Park), 272 B.R. 323, 332 (Bankr.D.N.J. 2001) (quotation marks and citations omitted). Then, if the plaintiff meets the initial burden, it "shifts to the debtor to satisfactorily explain the loss or deficiency." First Am. Title Ins. Co. v. Coven (In re Coven), No. 04–24703, 2007 WL 1160332, *7 (D.N.J. Apr. 17, 2007) (internal citations omitted).Whether the debtor provides a "satisfactory" explanation is determined at the Court's discretion. Id.  "A court is not concerned with whether the disposition of the assets was proper under the Bankruptcy Code, but rather only whether the explanation satisfactorily describes what happened to the assets." Id. (citing Sonders v. Mezvinsky (In re Mezvinsky), 265 B.R. 681, 690 (Bankr.E.D. Pa. 2001)).

Plaintiffs met the initial burden by presenting evidence through testimony and documentation regarding the Debtor's financial history, business ownership and property transfers. When questioned, the Debtor explained how and why each transaction occurred. He documented and testified thoroughly as to the loss of monies through Elon and After 5. Debtor admitted both to the Court, and to the Chapter 7 Trustee, that the money he received from the sale of his medical supply company went into both Elon and After 5 and various investments. The Transplant Connect stock was of unspecified value and was subject of an attempted transfer to his children years earlier. Furthermore, Plaintiffs other allegations of the existence of bonds, options, and hidden cash were not proven by Plaintiff. Debtor testified he never had those assets. Therefore, the Court finds the Debtor has satisfactorily explained how loss of assets occurred and that Plaintiffs have not met their burden under 11 U.S.C. §727(a)(5).

## V.    CONCLUSION

For the reasons stated above, Plaintiffs are entitled to an order and judgment in this adversary proceeding declaring non-dischargeable the amount of $51,250 pursuant to Section 523(a)(4). Judgment in favor of the Defendant will be entered as to all other counts.


Dated:   January 31, 2014

_____
Honorable Gloria M. Burns
Chief Judge, U.S. Bankruptcy Court